Donald Reed appearing for appellant, Nancy Goldenberg appearing for appellee. All right, Mr. Reed. I feel like we should let you breathe between these, but... It's fine. Maybe you want to reserve 14 minutes of your time. Yeah. Hopefully this will be easier, so maybe just five minutes. All right. All right, you may commence. In this case, Your Honors, the bankruptcy court denied a debtor a discharge under 727.82 and 727.83. Under 727.82, the court denied that, well, 727.82 denies a debtor who, with intent to hinder the layer of the fraud accreditor, has transferred property of the debtor within one year of the petition date. The term transfer is defined by Section 101, which provides a relative part, each mode, direct or indirect, absolute or conditional, voluntary or involuntary of disposing with or parting with property. This definition applies universally throughout the Code, including 548 and 727. A common-sense understanding of the term transfer includes a transferor and a transferee. In the avoidable transfer context, the Ninth Circuit here would hold that the bank was not an initial transferee because it did not have dominion or control of the deposited funds. Instead, the bank provided the service to the debtor. It was a conduit for his transactions by substituting a credit for the deposited funds. The debtor did not dispose of or part with any property by making the deposits. He merely changed the form. Indeed, even his deposited funds would have been property of his bankruptcy estate. Can I ask you a question? I want you to return to the argument because I know this is important here. Are you basically telling us we're going to have to just say that Bernard and Schaefer were wrongly decided? Schaefer would be wrongly decided. Bernard, I think you distinguish, and Collier has distinguished that case. Okay. I'm happy to elaborate. No, I just wanted to know what you were asking us to do. You should return to your argument. Thank you. If the debtor's deposits into the bank could not be avoided as a fraudulent transfer, then they should not be used to establish a basis to deny a debtor a discharge under 727-82, especially as denial and exceptions to discharge are interpreted liberally and favorably. Well, is it so much that it's not a fraudulent transfer as it is you can't get it from that transferee? Isn't that really the bigger... Well, I would argue it's not a transfer at all because at all times the debtor had the same amount of money. It just changed the form. It changed from a deposited check... And what the other cases suggest is, in fact, the property interest transfers to the bank to get it back, right? Right. Those cases are relying on the legislative history. It strikes me that... I mean, I think you're correctly describing the fraudulent transfer cases in that they get to a different result, but in my view, that's largely because the point of the fraudulent transfer statute is to get something back into the estate, and we're not worried about that under 727. But on the other hand, the debtor's deposited funds in his own restricted checking account in his own name is still property of the debtor. But that's almost kind of the point, right? I mean, I know that you want to look at... A transfer means that you have to do something to get it back, but the technical answer under Bernard and Locke, I think, is that the debtor has parted with it. It is the bank's money now subject to a claim by the debtor. That's number one. Number two, the point of the fraudulent transfer cases is who are we going to tag, right? It's really a 550 question. If you're talking about a transfer, the focus is can we get it back from this entity? And if the answer is you shouldn't because they didn't really control it, they're a conduit, that's a whole other question whether the debtor did something that we're going to find wrongful for purposes of the discharge. I mean, to me, that's the distinction. You don't have to agree with it, but that's the way I see it. Yeah, well, I think the term transfer, though, needs to be universally applied throughout the Code. And to have a transfer, you need a transferee. If you don't have a transferee, then you don't have a transfer. And so my argument would be that the bank did not get any of the funds. They're not the bank's funds. They're holding them in trust for a divorce. But the whole point of this, and by the way, I understand there's some sympathy here. The debtor says, I didn't want to leave it here. I wanted to put it somewhere else so everybody could have the benefit of it, right? And I didn't want just these very aggressive creditors to be able to come get it. That's the point of moving the money, right? And I understand, and that was the same circumstances in Schaefer. But how is that not a transfer? I mean, by the debtor's own acknowledgement, if it's here, it's subject to these people coming and grabbing it. If I put it somewhere else, it isn't. How is that not a transfer? He's moving money from one pocket to the other. And it's in his name. It's an unrestricted account. It's in his name. It's subject to levy. He's not, he's just moving money around. And if you can't avoid a transfer to the bank because they're not a transferee, I don't see how you can deny him a discharge because he made a transfer. But they're not a transferee in the sense that they don't really have the benefit of it, right? I mean, the point of fraudulent transfer law is you transfer something for no value or little value or with actual intent, and you need to go, I mean, the intent is the transferors, but the money is the transferees, right? That's the problem with fraud, the complication of fraudulent transfer law. And what I'm suggesting with 727 isn't worried about the second part of that. We don't care where it went. It doesn't matter. The point is the debtor did this thing with the wrong intent, which you may think was a sympathetic wrong intent, but per the law is the wrong intent. And the transfer was made to that effect. And I think we just stop the question there. Well, I think you're assigning different meanings to the term transfer. Okay, well, I just think we just don't agree about that. Okay, I understand. Can we talk a little bit about the records, the second piece of this? Because, you know, I think it's important to look at that, and I'm troubled by that piece of the transfer, I'll be honest. To get a discharge, we have to also find that he had appropriate records, do we not? And provided them. Yeah, and he provided all his bank statements. All revenues came into one account. All credit cards were deposited into that account. Those bank statements include the total universe of his revenues. But on an accounts, on a customer accounts-based business, isn't it important to be able to identify what he couldn't identify here? Which is basically what's his standing with respect to, you know, this person still owe him any money? You know, does he owe them a refund? You know, did he buy assets for them? Does he have them? And none of that was clear. The U.S. trustee, well, the trustee here could not figure that out, right? Yeah, but I'd argue that we could. And we tried to do that in the trial brief, and we tried to do it at the trial, but the U.S. trustee in the court would not let him testify as to some of these issues. Again, I think it's important to note that the U.S. trustee's declaration and the debtor's declaration were filed concurrently. And so we did not know what the U.S. trustee, what evidence they were presenting, and we both presented our evidence concurrently. And so I think the bankruptcy court denied the debtor a due process and a real opportunity to address the issues that were raised in the Steele declaration. Further, you know, I'm a solo practitioner. He was a solo contractor and the counsel was a solo practitioner. We understand how credit card processing works, how a square works, but it was very evident that the court had questions, and the U.S. trustee also had questions, about how these transactions are processed. And so, you know, I think the court denied the debtor a real opportunity to go through his bank statements and refer to Ms. Steele's declaration and say, you don't think those checks were deposited? Well, here they are. Or you don't think that credit card was? Well, here it is in the bank statement. So I think he deserved an opportunity to do that. Well, wasn't there, you know, I'm not trying to argue with you here, but wasn't there a long period of time during which the U.S. trustee, you know, tried to reconstruct this, and there was a long dialogue with your client, and what your client gave was the expense side, but not the asset side? And, you know, I mean, there seems to be months of that happening here. You get to a trial and, you know, now you want to, quote, explain it, close quote. I mean, I think that doesn't really work very well for me. I mean, it seems to me that if your client could have done that, it could have been done during the months prior to the trial. Well, it was a 2004 exam, but yeah, they didn't actually specify which transactions, I mean, we're talking about, there's like a million dollars of revenue running through this account over a given year. And so if they wanted to identify certain transactions, well, we could have done that, but that was never done in the 2004. I mean, isn't that the shoe kind of on the wrong foot? I mean, doesn't your client have to come in and show in his initial matter, here's what the situation is. If the U.S. trustee has particular questions, they can ask them. Is it really on them to tell you, you know, how to demonstrate your financial condition? I think he did, though. I mean, he provided all the bank statements. He testified consistently throughout the 341As and the 2004. He answered their questions honestly and truthfully. The U.S. trustee does not dispute any of that. We don't know ahead of time what the U.S. trustee is going to take with this presentation. So it wasn't even until the U.S. trustee... You know, respectfully, we don't know where the money came from and we can't figure out anything on the account side of this. It's not a quibble. You do know where, I mean, you do. I think they do. Former customers know exactly what they paid and when they paid it. We can link it with the bank statement. And I'll reserve the rest of my time. Okay, thank you. All right, Ms. Goldenberg. Good morning, Your Honors. May it please the Court, Nancy Goldenberg on behalf of the United States trustee in this matter. Your Honor, the Court can affirm the bankruptcy court's denial of discharge under either 727A2 or 727A3. And with the Court's permission, I'll address the A3 grounds first. 727A3 mandates a denial of discharge where a debtor has failed to keep records about, quote, business transactions, close quote. There's no question here that this debtor who ran a successful business for years with over 9,600 customers never produced all business records, including any comprehensive list of clients, any client contracts, any receipts, a transaction log, purchase orders, information about subcontractors, or anything else. And the debtor doesn't suggest otherwise. Instead, at trial, he principally argued that he failed to meet this obligation to produce records due to an illness and a business move. However, both of these factors, according to the debtor himself, started in the last quarter of 2017. And the documents that were requested, we requested them from the start of 2017 or for some documents, the request was made for even an earlier period. But they were never produced. And the bankruptcy court made a common-sense ruling acknowledging that no records were tracking individual projects or even tying in customer payments to bank statements for the period before Mr. Devine's challenges. On the record, Mr. Devine admitted that as his business grew, he, in essence, he didn't have a good tracking system. He admitted that he lost track of project-by-project income and expenses, and he wasn't sure of exactly what he credited when he was preparing his schedules. As the trial court found, without customer records, the debtor, as this court has also made mention of, couldn't even track how much a customer had paid and how much it still owed. The trial court properly found that customer records for a remodeling business of this magnitude were such an integral part of the business that the record supports as an alternate basis that Mr. Devine's failure to produce such records could have been a concealment under supporting a denial of discharge under A3. Is that based just on an inference that, gee, there must have been there somewhere? How do we assess that finding? The court made alternate findings. It definitively made a conclusion that there were no records kept because there was nothing produced. But with respect to the concealment finding, that was based on the court's conclusion that this is such an integral part of a business that wasn't just started up months before the bankruptcy. Mr. Devine had been in business for years, so there had to be some kind of more organized tracking of where in essence it wasn't produced. With respect to Mr. Devine's argument that it was error that he'd not be allowed to testify at trial about credit card processing fees, this district provides for direct testimony by declaration, and in fact both the U.S. trustee and Mr. Devine submitted declarations months and months before trial. And to the extent that Mr. Devine thought the information regarding tracking of particular processing fees was essential, he should have put it in his declaration. He also could have requested the ability to provide live testimony, as the rules do give the trial court discretion to allow live testimony. However, 9013.I1 specifically indicates that if there is to be live testimony permitted by the court, all parties need to be given at least two days' notice, and that was not the case here. And therefore it was certainly within the court's discretion to either allow or not allow live testimony during the trial, which in essence would have been unfair to the U.S. trustee who was given absolutely no notice that that was an intent. And there was enough time to give that notice of intent to ask for live testimony, right? There certainly would have been enough time, because this was an issue that was raised in declarations by Ms. Steele of my office nine months prior. So to the extent the debtor disagreed with it, he had months and months to request the ability to provide live testimony or supplement his affidavits. Ms. Goldberg, so it appears that he was arguing that he was kind of surprised by the declarations that were filed and didn't have the chance to explain. And because there was a joint filing, he didn't have advance information. And what you're suggesting is there were months between the time the declarations were filed and the time the trial was conducted that he could have requested the opportunity to one, cross-examine the U.S. trustee about anything they didn't really understand and or present additional information either live or in the form of an amended declaration to address those in advance of the trial? Your Honor, the time frame was as follows. I believe it was either eight or nine months before the trial. There was a deadline for both parties to submit declarations and the U.S. trustee might have filed their declaration a bit early, maybe a day or two before Mr. Devine's. But saying they were filed simultaneously, that's certainly close to what happened. However, there were also trial briefs which were filed maybe a week or two weeks before the trial. And in Mr. Devine's trial brief, he actually went into great detail addressing the issues raised by the U.S. trustee in its declarations which had been filed months earlier. So he certainly had an opportunity to put in additional information regarding how the credit card processing worked, had he felt that that would support his case. And was there an agreement between the U.S. trustee and the debtor not to seek cross-examination and just to rely on the declarations? Yes. As set forth in the transcript for the trial, both parties at trial waived their right to cross-examine at the onset of the trial. And even if the court had allowed and if there was additional testimony with respect to these processing fees, that would have not overcome the A3 problem. Again, there was absolutely no tracking information regarding customer accounts. And even Mr. Devine's attempt at providing limited income regarding certain customer payments made to him as set forth in the bank statements he provided, he relied on four declarations that were filed by customers that the U.S. trustee worked with to indicate what they had paid to Mr. Devine. The schedules had 35 customers who had substantial claims in this case. So the other 31 customers didn't provide information. Mr. Devine apparently had no information and didn't even try to track the information to the bank statements that he submitted. So for the large majority of customers, there was absolutely no information tying in what they had paid because according to Mr. Devine, he didn't know what they had paid to the bank statements that he provided. With respect to the A2 argument, the only issue raised by appellant, as Mr. Reed indicated, to challenge the A2 denial of discharge is whether the debtors admitted use of a new levy on the old account was a transfer. It's undisputed in the record that the new account was opened within a month before the bankruptcy filing. This is an A2A claim. And it's also undisputed that it was made to hinder or delay creditor collection efforts. I appreciate the courts commenting that Mr. Devine did this so that all creditors could be treated equally instead of aggressive creditors basically levying his accounts. However, he did it before he filed for bankruptcy, and he did it to continue in business. I don't know what was in his mind in terms of trying to protect other creditors, but he clearly did it before the bankruptcy filed. Schaefer basically indicates that's neither here nor there, right? Correct. In Mr. Devine's own words, he used the new account to, quote, avoid confessions of judgment, end quote, and because his lenders, quote, just empty out your bank accounts, end quote. And that's in my brief and in the record. Appellant's interpretation of the Bullion case, we believe, Your Honor, is misplaced. It does not conflict with the circuit court's ruling in Bernard, and both of these cases were authored by circuit court Judge Trott, and they're entirely consistent. The Bullion court never addressed intent under 101-54. It specified that it was, quote, faced with the narrow issue of whether, defendant in that matter, was a transferee of $1.5 million within the meaning of Section 550A1 or 550A2, and that's on page 547. In contrast, the Bernard case, on which we rely, as well as the Schaefer case containing almost identical facts, specifically, that court specifically discussed and interpreted transfer under 101-54 to include deposits into a general bank account as supporting a denial of discharge under A2. It relied on the legislative history, which specifies that, quote, a deposit into a checking account is a transfer, end quote. Very clear. The Bernard case also held that a bank deposit passes title of the deposited funds, and, quote, such money becomes property of the bank, and the bank becomes the debtor of the depositor, and that's on page 1282. So, based on our analysis of applicable case law, we believe that there certainly was a basis for the trial court to deny discharge under both A2 and A3, and I have nothing further unless the court has additional questions. No, thank you. All right. All right, Mr. Reed, you have just under five minutes. Thank you. Regarding the 727-82, the debtor's account was getting actively led by creditors, one particular creditor. In the meantime, he had all these unfinished jobs, these former customers who are the alleged victims of all of this, and by trying to continue operating, he was actually benefiting those very parties. He could not operate without access to a banking institution. With regards to Bernard, Bernard's distinguishable because that was the withdrawals from a bank account where the debtor used them for vacations and gambling debts and likewise. In the treatise specifically, it distinguishes that fact pattern from other case law, including the more recent Fourth Circuit case in Ivey, which again addresses whether a debtor's deposit into an account is a transfer. Finally, with regards to the 727-83, the real issue is that he could not link various customer payments to his bank statements. Again, the debtor had no knowledge ahead of time what the U.S. Prestige evidence was or complaints were with regards to the sufficiency of those records. Frankly, I don't understand the utility of this whole investigation. It feels more like a test or a quiz than it really serves any useful purpose. This was a no-asset bankruptcy case. If it was an asset bankruptcy case, the creditors know exactly what they paid the debtor and could file proofs of claim. I don't see how any further insight into the debtor's financial affairs is gained. What do we do with that, assuming we agree with you? Assume that I agree that I'm not sure what this tempest in the teapot, why it came to this moment, given that it's not going to make one hell of a difference in terms of what creditors get. What do I do with that? The code language is clear. The code language says it denies the debtor a discharge who failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained. I would argue he produced everything. He produced the bank statements that show all the revenues going into his account. Again, there's no allegations or findings that he did anything improper with the monies that were deposited into that account. What about the difference between financial condition? What you might be saying is, look, if you're insolvent enough, who cares? That seems to be the argument. But what about business transactions? Why is that a separate term? That, I think, goes to the U.S. Trustee's position that this is an accounts-based business. We had the right to know what the status was of these different accounts. The purpose of 727.83 is to make the debtor's discharge dependent on the debtor's true presentation of his financial affairs. This removes the risk to creditors of the withholdment or concealment of assets by the debtor under the cover of a chaotic or incomplete set of books and records. The whole purpose of 727.83 is to make sure that the debtor is presenting the full picture, that he is indeed insolvent. I disagree. You have the bank statements which show all the revenues coming in into his account. So everything that he received gets dumped into that one account. Is the other information, though, necessary to establish the truth of what you just said? I mean, isn't that the problem? Without this other set of information, how would you know that that's true? And don't they have the right to records that allow them to come to that conclusion? There's no allegation otherwise. I mean, there's no allegation that he was using a different account or that he was diverting funds or anything. But wouldn't a predicate of that be, you know, you look at a few of the business transactions, it looks like, you know, he's $500,000 ahead of his obligations, and if that money isn't showing up somewhere, wouldn't that be exactly what Judge Taylor's suggesting? I mean, if we don't have the first piece of this, how do we know? How are we ever going to know? Well, you have his testimony. You have all the bank statements. I mean, again, it was never even an issue. It was never raised. So, again, I feel like the debtor is being forced to prove a negative to a certain extent. All right. Well, you're over your time. I am sure if anyone is done with oral argument today, it is you. So, congratulations on running the gauntlet. That was an impressive... So, you know, why not have all of these on the same day? All right. So, with that, thank you very much. This matter will be under submission, and we will call the last matter for the day.
judges: Taylor, Lafferty, Gan